| United States District Court | Southern District of Texas |
|---|---|

| A. L. Ballard, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| versus | § | Civil Action H-05-3454 |
| | § | |
| Devon Louisiana Corporation, | § | |
| | § | |
| Defendant. | § | |

# Opinion on Summary Judgment

1. *Introduction.*

This is a dispute over a joint operating agreement from 1971 for oil properties in Montana. The plaintiff wants to reinterpret long-standing operation under it.

2. *Bear Paw Mountains.*

In 1966, two oil companies began exploring for oil and gas between the Missouri River and the Bear Paw Mountains in central Montana.

In 1971, the companies agreed to explore 360 sections – 230,400 acres – roughly 120 miles east northeast of Great Falls. They named the area Sherard and agreed to operate it jointly as an area of mutual interest. They embodied this deal in a joint operating agreement. It included participation and other rights in the area of mutual interest.

In a farm out agreement, the owner of a lease agrees to allow another operator to drill some of the acreage and share in the production. The 1971 agreement had two farm outs: the working interest owners – the two companies – assigned a working interest to an operator to drill twenty wells within three years. The two companies each got a portion of the net proceeds of the operator's production.

3.  *Successors.*

Since 1971, the interests of the original participants have been assigned several times. A man named A.L. Ballard now owns a portion of the working interest once belonging to Kilroy, one of the original oil companies. Devon Louisiana Corporation has succeeded to a portion of the working interest of High Crest, the other original oil company. Devon has also become the operator. The parties will be called by their current names.

Ballard has moved for judgment against Devon, saying that it ignored his contractual opportunities to participate in 109 of the leases within Sherard. Devon has also moved for judgment, saying that Ballard's rights had ended in 1974 under the agreement.

4.  *Mutual Interest.*

Under section 31(F) of the agreement, if either party acquired an interest in Sherard, each was obliged to offer a share to the other at its cost. The parties operated from 1971 through 1974 without dispute.

Section 31(F) consists of five paragraphs. The first sentence of the final paragraph says, the "above subparagraph of 31 F" terminates after three years from the date of the operating agreement. The preceding paragraph deals with surrendering townships – six sections by six sections. The term "subparagraph" is used inconsistently throughout the agreement.

Devon says that the parties' obligations in Sherard unequivocally ended in 1974 because the first sentence of the final paragraph refers to the entire 31(F) section governing mutual-interest obligations. Devon also says that, without the three-year limit in that paragraph, the obligations are perpetual.

Ballard contends that the three-year term governed a different clause. He says that because the parties inserted the preposition "of" before 31(F), the three-year term referred to the preceding paragraph on surrendering a township, not the entire purpose of 31(F) on mutual interest.

Devon responds that even though the preposition appears before 31(F), it was a typographical error because it would not have offered Ballard an interest in perpetuity without consideration. Devon also says some earlier drafts and some later contracts in the region had the preposition and some did not, illustrating its insertion was adventitious.

More important, Devon has the parties' operating history to reflect their intention and understanding of their rights. Devon contends that Ballard has no interest in the 109 leases

because (a) the contract does not assign a perpetual interest; (b) the parties had signed other farm outs after 1974 with different terms for the area of mutual interest; and (c) Ballard chose not to sue for his interest until 2005, even though he was aware of his exclusion as early as 1976.

5. *Intent.*

When interpreting a contract, words inconsistent with the parties' intent or the nature of the contract are rejected. Mont. Code. Ann. § 28-3-503 (2009). A court will read the document as a whole and in its context to ascertain the parties' intent; the court will not read disputed words in isolation. *See, e.g., Rumph v. Dale Edwards, Inc.*, 600 P.2d 163, 168 (Mont. 1979); *see also* John Paul Stevens, *The Shakespeare Canon of Statutory Construction.* 140 U. Pa. L. Rev. 1373 (1992).

A sound way of guiding our feet is with the "lamp of experience." Patrick Henry, Address at the Second Virginia Convention (Mar. 23, 1775). The parties' history illuminates the interest owners' understanding of their legal interests. Here, the parties have thirty years of history to reveal their intent.

6. *Deal.*

To protect their investments in the Sherard leases, Devon and Ballard crafted the provision on mutual interest. They also included a surrender clause to assure that the costs as well as benefits of those investments would be shared.

If a party to a lease does not pay its share of the acquisition and operating costs, it loses its interest in that lease. This is a nearly universal term of joint-operating agreements. The entire agreement illustrates that Ballard and Devon understood this agreement be a joint venture; outside of that subparagraph, the parties also agreed to bear their proportional interests for costs of title defects, operating, taxes, settlement fees, and other items.

Devon and Ballard's agreement contained a farm out. The purpose of the farm out was to allow the operator a limited time to earn an interest in the lands. The operator was obliged to drill twenty wells and the final phase of the drilling was to begin in 1972, so that the wells would be completed within the three-year term ending in 1974. If, as Ballard proposes, the joint venture's sharing of leases in the area had no end, the deadline for completion of the wells could have been anything. Instead of a random date, knowing that they wanted to have the

results from the initial wells in time jointly to exploit it, Devon and Ballard gave the operator a deadline consistent with the specific end to the cross-leasing obligations.

7.     Context.

In 1971, when Devon and Ballard negotiated the agreement, like other oil companies they had a practice of concluding the time to explore the area of mutual interest. In fact, Devon retained the same oil and gas attorney, Louis Moore, to draft all of its contracts for areas of mutual interest.

For the 1971 agreement, Moore testified that Devon had instructed him to draft a provision for an area of mutual interest with Ballard with a three-year term. Moore supplied his handwritten notes from a telephone conversation with Devon's landman about Sherard; the notes demonstrate that Devon intended to limit the mutual interest to three years.

Moore has testified that the insertion of the preposition was a typographical error. In support of this testimony, he produced a draft without the preposition that he thought was the final version. When he learned that the parties had continued to negotiate some non-substantive issues, he was not concerned about the term on mutual interest because he knew that Alf Ball, Devon's landman, would have asked for his counsel before signing it if they had changed something material.

Moore also supplied correspondence between Devon and Ballard from 1967, where they had agreed to limit a similar area of interest to three years. For areas where the companies wanted more than three years, they would fix an end date in their agreement. Their 1969 contract for another area had an expiration date of 1988 –19 years.

Moore swore that he would never have advised his client to sign a contract for a perpetual interest. He knew – and told his client – that it would have violated the rule against perpetuities. Mont. Code. Ann. § 72-2-1002 (2009).

8.     After 1974.

The parties' actions after 1974 illustrate that Devon and Ballard intended and understood that their interests in Sherard had expired within three years.

In 1976, the original parties executed another farm out that covered some of the same land — 25N and 26N, Range 16E — as the 1971 agreement. This new agreement would not have been needed if they had understood that the 1971 agreement was still in effect. Again in

1984, the owners signed a farm out with a four-year term for some of the Sherard townships. The new, overlapping farm out is a demonstration in fact that the parties considered the 1971 agreement to have ended.

In June and July 1976, Moore and Ballard exchanged letters about part of Sherard. Ballard responded to Moore that he needed more information about those leases that were within the boundaries of their "previous areas of interest." Ballard, thus, acknowledged that he knew in 1976 that he had a former interest in Sherard. In 1998, even Ballard's own landman, William H. Fite, sent him a memorandum about Sherard, telling him that another operator — Ocean Energy, Inc. — had acquired new leases that did not include Ballard. Yet, Ballard did nothing to investigate then — not until he sued in 2005.

Other people who have administered contracts in Sherard after 1974 – Phyllis DeLong, Jack Padon, Dennis Sharp, Brad Kemp – also have sworn that they did not offer Ballard interest in Sherard based on the 1971 joint operating agreement. Ballard, on the other hand, has nothing indicating that Devon or others have honored an interest arising from the 1971 agreement with anyone, including himself. Devon has produced ninety-nine leases that show that it offered an opportunity for Ballard to participate, but they were all for interests not arising from the 1971 agreement.

9.  *Function.*

Ballard says that the proper interpretation of the preposition should be literal. He says that because the surrender clause was placed above the clause on the three-year limit, the parties intended the surrender clause to expire within three years, not the entire subparagraph on mutual interest. He, therefore, interprets his interest in Sherard to be perpetual.

To argue a provision is ambiguous, the contestant must present a plausible alternative interpretation. No oil company would knowingly create a perpetual interest.

Ballard's interpretation furthermore does not conform with the purpose of a surrender clause. Surrender clauses protect the interests of those who actually shoulder the risk of loss in a particular endeavor by preventing surrendering parties from later sharing in the benefits of the investment. Under Ballard's reading, a party would be permitted to participate in the area of mutual interest after refusing to participate in the risk associated with the leases and the well. Ballard's interpretation is not only implausible, it is also inconsistent with the rest of the joint

operating agreement that repeatedly requires a sharing of expenses and losses in accordance with the parties relative interests.

10.   *Laches.*

Devon also says Ballard waited too long – nearly thirty years – before suing, and Devon is prejudiced by it.

Ballard has known Devon's coordinating its interest in Sherard with him ended as early as 1976, when Moore wrote to him about the option to renew or replace old leases. Even if Devon had not told Ballard of their interests in the 1970s, Ballard has worked in oil and gas for decades. Oil leases are public records, easily attainable. Yet, Ballard chose not to identify or assert his interest until 2005.

These leases that Ballard "found" are federal leases, another easily verifiable fact. Other leases Ballard uses as proof of Devon's having recognized his rights of did not arise out of the 1971 agreement. Although he participated in them after 1998 and they cover some of the area, the offer to him was for different percentage than from the 1971 agreement under an apparent distinct deal.

Ballard's delay in filing suit prejudices Devon's defense because too much time has elapsed to preserve evidence. In the course of Ballard's delay, key witnesses have died and important documents are lost. For example, Alf Ball, Devon's landman, died, depriving Devon of important testimony. *Schnatz v. Minow*, 411 P.2d 362, 375 (Mont. 1966). In the three decades, each side of the 1971 agreement has been sold, merged, and reacquired, and the people and papers have come and gone.

11.   *Error.*

Based on the purpose of the agreement, the operating history of the parties, and the testimony of the drafting attorney, it can be concluded as a matter of law that the preposition was a typographical error. Devon and Ballard unequivocally intended for their mutual obligation in Sherard to expire in 1974. Ballard watched everyone through at least a dozen companies over thirty years treat the commitment as over.

Because the provision is not ambiguous, reforming it is not required.

12.   *Conclusion.*

Since 1974, Devon's obligation to offer Ballard a share in new leases in the Sherard area has been dead. Like the parrot in a *Monty Python* sketch, the interest has "passed on! . . . is no more! It has ceased to be! It's expired and gone to meet its maker! This is a late [interest]. It's a stiff! Bereft of life, it rests in peace! . . . It's run down the curtain and joined the choir invisible! This is an ex-[interest]!" "Dead Parrot Sketch." *Monty Python's Flying Circus, Season 1*. BBC One. 7 Dec. 1969.

A. L. Ballard will take nothing from Devon Louisiana Corporation.


Signed on June 22, 2010, at Houston, Texas.


                                                       Lynn N. Hughes
                                        United States District Judge